**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO**

| | | |
|---|---|---|
| DINÉ CITIZENS AGAINST RUINING OUR ENVIRONMENT, *et al.*, | ) ) ) | Case No. 1:15-cv-0209-WJ-SCY |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| SALLY JEWELL, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| _____ | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF MOTION
FOR PRELIMINARY INJUNCTION**

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.     BLM'S CURRENT OIL AND GAS MANAGEMENT FRAMEWORK .........................2

II.    DRILLING AUTHORIZATIONS GIVING RISE TO THIS LITIGATION.....................4

III.   THIS LITIGATION AND THE NEED FOR A PRELIMINARY INJUNCTION ............5

ARGUMENT .........................................................................................................................6

I.     CITIZEN GROUPS WILL SUFFER IRREPARABLE HARM IF THE COURT
DOES NOT GRANT AN INJUNCTION..........................................................................7

     A.    The Greater Chaco Landscape Will be Irreparably Harmed by Continued and
Future Horizontal Drilling and Hydraulic Fracturing of the Mancos Shale ...........8

     B.    The Public Health of Diné and Other Community Members is Threatened by
Ongoing and Future Development of the Mancos Shale ......................................10

     C.    BLM's Continued Authorization of Mancos Shale Drilling Permits Absent
NEPA Compliance Threatens Irreparable Harm ....................................................11

II.    THE BALANCE OF HARMS FAVORS GRANTING AN INJUNCTION ...................13

III.   THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION .........................16

IV.   CITIZEN GROUPS ARE LIKELY TO SUCCEED ON THE MERITS .........................17

     A.    BLM Violated NEPA by Failing to Analyze the Environmental Impacts of
Fracking Authorized by the Challenged APDs.....................................................18

          1.    BLM Tiered to an EIS That Does Not Analyze the Impacts of
Horizontal Fracking ..................................................................................18

          2.    BLM Failed to Analyze the Cumulative Impacts of Drilling 239 New
Wells in the Mancos Shale........................................................................21

     B.    BLM Unlawfully Segmented its APD Approvals ................................................24

V.     THE COURT SHOULD NOT IMPOSE A BOND.........................................................26

CONCLUSION.....................................................................................................................26

# TABLE OF AUTHORITIES

## CASES:

*Acierno v. New Castle Cnty.*,
40 F.3d 645 (3d Cir. 1994).............................................................................15

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)..................................................................................7, 13

*Anglers of the AU Sable v. U.S. Forest Serv.*,
402 F. Supp. 2d 826 (E.D. Mich. 2005).............................................................8

*Baltimore Gas & Elec. Co.*, v. *Natural Resources Defense Council*,
462 U.S. 87 (1983)........................................................................................23

*Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*,
75 F.3d 1429 (10th Cir. 1996) .........................................................................7

*Ctr. for Biological Diversity v. Bureau of Land Mgmt.*,
937 F.Supp.2d 1140 (N.D. Cal. 2013)...............................................................19

*Colo. Envtl. Coal. v. Dombeck*,
185 F.3d 1162 (10th Cir. 1999) .......................................................................18

*Colorado Wild v. U.S. Forest Serv.*,
299 F.Supp.2d 1184 (D. Colo. 2004)................................................................16

*Colorado Wild Inc. v. U.S. Forest Serv.*,
523 F.Supp.2d 1213 (D. Colo. 2007)......................................................... passim

*Connor v. Burford*,
836 F.2d 1521 (9th Cir. 1988) .......................................................................21

*Davis v. Mineta*,
302 F.3d 1104 (10th Cir. 2002) ................................................................ passim

*Diné CARE v. U.S. Office of Surf. Mining Reclamation and Enforcement*,
2015 WL 996605 (D. Colo. March 2, 2015)......................................................20

*Earth Island Inst. v. U.S. Forest Serv.*,
351 F.3d 1291 (9th Cir. 2003) .......................................................................21

*Fairway Shoppes Joint Venture v. Dryclean U.S.A. of Florida, Inc.*,
1996 WL 924705 (S.D. Fla. 1996) ..................................................................11

*Friends of the Earth v. U.S. Army Corps. of Eng.*,
109 F.Supp.2d 30 (D.D.C. 2000) .................................................................25

*Gold, et al.*,
108 IBLA 231 (April 24, 1989) ...................................................................15

*Grand Canyon Trust v. Federal Aviation Administration*,
290 F.3d 339 (D.C. Cir. 2002) ..............................................................15, 22

*Great Basin Mine Watch v. Hankins*,
456 F.3d 955 (9th Cir. 2006) ......................................................................22

*Greater Yellowstone Coal. v. Flowers*,
321 F.3d 1250 (10th Cir. 2003) ....................................................................7

*High Country Conserv. Advocates v. U.S. Forest Serv.*,
2014 WL 2922751 (D. Colo. June 27, 2014) ..............................................24

*High Sierra Hikers Ass'n v. Blackwell*,
390 F.3d 630 (9th Cir. 2004) ......................................................................14

*Kern v. BLM*,
284 F.3d 1062 (9th Cir. 2002) ...............................................................20, 23

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ....................................................................................25

*Marsh v. Or. Natural Res. Council*,
490 U.S. 360 (1989) ....................................................................................14

*Monsanto v. Geertson Seed Farms*,
561 U.S. 139 (2010) ....................................................................................11

*Mont. Wilderness Ass'n v. Fry*,
310 F.Supp.2d 1127 (D. Mont. 2004) .........................................................19

*Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*,
463 U.S. 29 (1983) ......................................................................................21

*Nat'l Wildlife Fed'n v. Burford*,
835 F.2d 305 (D.C. Cir. 1987) ......................................................................8

*Nat'l Wildlife Fed'n. v. Appalachian Reg. Comm'n*,
677 F.2d 883 (D.C. Cir. 1981) ....................................................................25

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
  565 F.3d 683 (10th Cir. 2009) ...........................................................................12, 17, 18, 23

*N. Plains Res. Council v. Surface Trsp. Bd.*,
  668 F.3d 1067 (9th Cir. 2011) .............................................................................................21

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*,
  389 F.3d 973 (10th Cir. 2004) ............................................................................................14

*Pennaco Energy, Inc. v. U.S. Dep't of Interior*,
  377 F.3d 1147 (10th Cir. 2004) ...............................................................................18, 19, 20

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989).................................................................................12, 13, 18, 26

*RoDa Drilling Co. v. Siegal*,
  552 F.3d 1203 (10th Cir. 2009) .............................................................................................6

*San Luis & Delta-Mendota Water Auth. v. Locke*,
  2010 WL 500455 (E.D. Cal. 2010)......................................................................................16

*San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife Serv.*,
  657 F.Supp.2d 1233 (D. Colo. 2009)...........................................................................8, 13, 15

*Save Our Sonoran, Inc. v. Flowers*,
  408 F.3d 1113 (9th Cir.2005) ..............................................................................................15

*Save Strawberry Canyon v. Dep't of Energy*,
  613 F.Supp.2d 1177 (N.D. Cal. 2009) .................................................................................13

*Seattle Audubon Society v. Evans*,
  771 F.Supp. 1081 (W.D. Wash. 1991).................................................................................16

*Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*,
  841 F. Supp. 2d 349 (D.D.C. 2012)............................................................................10, 16

*Sierra Club v. Hodel*,
  848 F.2d 1068 (10th Cir. 1988) ...........................................................................................12

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989)................................................................................................12

*Sierra Club v. Sigler*,
  695 F.2d 957 (5th Cir. 1983) ...............................................................................................24

*S. Fork Band Council of W. Shoshone of Nev. v. U.S. Dep't of Interior*,
   588 F.3d 718 (9th Cir. 2009) .................................................23

*Taxpayers Watchdog, Inc. v. Stanley*,
   819 F.2d 294 (D.C. Cir. 1987).............................................24, 25

*Utah Shared Access Alliance v. Carpenter*,
   463 F.3d 1125 (10th Cir. 2006) ...........................................18

*Valley Cmty. Pres. Comm'n v. Mineta*,
   373 F.3d 1078 (10th Cir. 2004) ...........................................15

*Vill. of Logan v. U.S. Dep't of Interior*,
   577 F.App'x 760 (10th Cir. 2014) ........................................7

*Vill. of Los Ranchos De Albuquerque v. Marsh*,
   956 F.2d 970 (10th Cir. 1992) .............................................16

*Wilderness Workshop v. BLM*,
   531 F.3d 1220 (10th Cir. 2008) ...........................................21

*Winter v. Natural Res. Def. Council*,
   555 U.S. 7 (2008)...........................................................6, 7

*Wyoming Outdoor Coordinating Council v. Butz*,
   484 F.2d 1244 (10th Cir. 1973) ...........................................16

*Wyoming Outdoor Council v. U.S. Army Corps of Eng'rs*,
   351 F.Supp.2d 1232 (D.Wyo. 2005)....................................17

**STATUTES:**

5 U.S.C. § 702....................................................................18

5 U.S.C. § 704....................................................................18

5 U.S.C. § 706(2)(A)...........................................................18

16 U.S.C. §§ 470 *et seq.*......................................................2

30 U.S.C. § 226(p)(2)(A)...................................................14, 17

42 U.S.C. §§ 4321 *et seq.*...................................................2

42 U.S.C. § 4332(2)(C).....................................................17, 18

42 U.S.C. § 4332(2)(C)(i) ...................................................................................20

42 U.S.C. § 4332(2)(C)(v) ..................................................................................12

## Regulations:

40 C.F.R. § 1500.1 ...............................................................................................17

40 C.F.R. § 1500.1(c) ..........................................................................................26

40 C.F.R. § 1501.2 ...............................................................................................12

40 C.F.R. § 1502.1 ...............................................................................................18

40 C.F.R. § 1502.20 .............................................................................................19

40 C.F.R. § 1502.22 .............................................................................................12

40 C.F.R. § 1508.7 .........................................................................................21, 26

40 C.F.R. § 1508.8(b) ..........................................................................................24

40 C.F.R. § 1508.9(b) ..........................................................................................20

40 C.F.R. § 1508.10 .............................................................................................20

40 C.F.R. § 1508.25(a) .........................................................................................24

40 C.F.R. § 1508.25(c) ...................................................................................18, 20

40 C.F.R. § 1508.27(a) .........................................................................................21

40 C.F.R. § 1508.28 .............................................................................................19

43 C.F.R. § 3161.2 ..........................................................................................14, 17

43 C.F.R. § 3162.1(a) .....................................................................................14, 17

43 C.F.R. § 3162.3-1 ...........................................................................................18

## Other Authorities:

79 Fed. Reg. 10,548 (Feb. 25, 2014) .....................................1, 3, 13, 14, 19, 21

Fed. R. Civ. P. 65(a) ..................................................................................................2

## LIST OF EXHIBITS

| | |
|---|---|
| 1 | 2001 Reasonably Foreseeable Development Scenario (excerpts) |
| 2 | 2014 Reasonably Foreseeable Development Scenario (excerpts) |
| 3 | Dec. 11, 2015 BLM Letter to Citizen Groups |
| 4 | Mike Eisenfeld Declaration |
| 5 | BLM APD Status Update |
| 6 | Susan Harvey Declaration |
| 7 | Sarah White Declaration |
| 8 | Victoria Gutierrez Declaration |
| 9 | Ruthie Locke Declaration |
| 10 | Adam Law Declaration |
| 11 | EA 2014-0175 (excerpts) |
| 12 | EA 2015-0066 (excerpts) |
| 13 | EA 2015-36 (excerpts) |
| 14 | EA 2015-45 (excerpts) |
| 15 | Kyle Tisdel Declaration |

## **<u>INTRODUCTION</u>**

This case is about the imminent destruction of the Greater Chaco Landscape in the San Juan Basin of northwestern New Mexico, one of America's most important landscapes because of its unique environmental and cultural setting. It is home to ancestral and contemporary Native American tribes, including Navajo, or Diné (translated as "the people"), that rely on the land to sustain their livelihoods and for traditional ceremonial practices. Chaco Culture National Historical Park, a United Nations World Heritage Site, is the heart of the Greater Chaco Landscape, linking outlying ancestral and contemporary communities, ceremonial sites, and geologic features via ancient ceremonial roads still visible across the landscape. But the Greater Chaco Landscape and its communities like the Diné are suffering the impacts of the latest extractive wave to hit the San Juan Basin—shale oil drilling—made possible by recent innovations in horizontal drilling and multi-stage hydraulic fracturing (collectively, "fracking").

Until recently, the Bureau of Land Management ("BLM") dismissed such development as economically and technically infeasible, admitting that it has never before analyzed shale oil development in the Basin's Mancos Shale formation through a programmatic planning process and associated environmental review of impacts. 79 Fed. Reg. 10,548 (Feb. 25, 2014). Recognizing this void, BLM announced its intention to prepare a Resource Management Plan ("RMP") Amendment and accompanying Environmental Impact Statement ("EIS") to account— for the first time—for reasonably foreseeable development of the Basin's Mancos Shale formation using fracking.

Unfortunately, despite the absence of a required programmatic plan and environmental review, BLM has nevertheless begun full-field development of the Mancos Shale by approving hundreds of individual drilling permits through boilerplate Environmental Assessments

1

("EAs").[1] In so doing, BLM undermines, limits, and prejudices the outcome of the pending RMP Amendment and EIS. BLM justifies its actions by wrongly tiering to Farmington Field Office's existing 2003 RMP and accompanying EIS ("2003 RMP/EIS), which never planned for or reviewed the impacts of Mancos Shale oil drilling using fracking, thus violating the National Environmental Policy Act ("NEPA"), 42 U.S.C. §§ 4321 *et seq.*, and the National Historic Preservation Act ("NHPA"), 16 U.S.C. §§ 470 *et seq.*

Unless this Court issues a preliminary injunction to maintain the status quo on the ground pending resolution of the merits of this case, BLM will continue to approve Mancos Shale drilling permits, allowing construction of roads, pipelines, and well pads, along with drilling and fracking shale oil wells, in violation of the law. The resulting harm to the environment will be irreparable. The balance of harms tips heavily in the Plaintiffs' favor, there is a strong public interest in protecting the environment and ensuring compliance with NEPA, and Plaintiffs are likely to prevail on the merits of their claims or, at a minimum, demonstrate a "fair ground for litigation." *Colorado Wild Inc. v. U.S. Forest Serv.*, 523 F. Supp. 2d 1213, 1223 (D. Colo. 2007) (citations omitted). Accordingly, Plaintiff organizations (collectively "Citizen Groups") respectfully move this Court for a preliminary injunction pursuant to Rule 65(a).

## BACKGROUND

## I.    BLM'S CURRENT OIL AND GAS MANAGEMENT FRAMEWORK

In 2001, BLM released a 20-year Reasonably Foreseeable Development Scenario ("2001 RFDS") to project fluid mineral development for the New Mexico portion of the San Juan Basin and to support agency decisionmaking for the Farmington Field Office's then-pending 2003 RMP. With respect to the Basin's Mancos Shale formation, the 2001 RFDS provided:

---

[1] The First Supplemental and Amended Petition for Review of Agency Action challenges 96 BLM decisions approving 239 APDs. Dkt. 13-1 (May 8, 2015).

> [E]xisting Mancos Shale and Gallup Sandstone reservoirs are approaching
> depletion and are marginally economic. Most are not currently considered
> candidates for increased density development or further enhanced oil recovery
> operations. It is anticipated that many Mancos/Gallup wells will need to be
> plugged within the term of this RFD.[2]

While the 2001 RFDS did mention horizontal drilling as a possibility in the Basin, BLM

ultimately dismissed the use of this technology as economically and technically infeasible. *Id.* at

8.3. In fact, the prospect of using horizontal fracking to develop the Mancos Shale was so remote

that the 2003 RMP and EIS did not even mention Mancos Shale or the type of horizontal drilling

and hydraulic fracturing technology necessary to develop it, let alone plan for that development

on the basis of a detailed analysis of that technology's environmental impacts and through

consideration of alternatives.

On February 25, 2014, BLM admitted as much, posting a Notice of Intent to prepare a

RMP Amendment and EIS ("Mancos RMPA/EIS") for the Farmington Field Office in the

Federal Register, 79 Fed. Reg. 10,548, which provided in part:

> The RMP amendment is being developed in order to analyze the impacts of
> additional development in what was previously considered a fully developed oil
> and gas play within the San Juan Basin in northwestern New Mexico …
> Subsequent improvements and innovations in horizontal drilling technology and
> multi-stage hydraulic fracturing have enhanced the economics of developing [the
> Mancos Shale] horizon … As full-field development occurs, especially in the
> shale oil play, additional impacts may occur that previously were not anticipated
> in the RFD or analyzed in the current 2003 RMP/EIS, which will require an EIS-
> level plan amendment and revision of the RFD for complete analysis of the
> Mancos Shale/Gallup Formation.[3]

In response to BLM's stated intent to prepare a programmatic amendment to its

2003 RMP to consider—for the first time—development of the Mancos Shale using

---

[2] 2001 RFDS at 5.24 (Exhibit 1)
[3] In October 2014, BLM released a new RFDS ("2014 RFDS") evaluating potential development
of the Mancos Shale for use in the pending Mancos RMPA/EIS. The 2014 RFDS, however, does
not analyze the environmental impacts of this development and therefore cannot be used to meet
the agency's NEPA obligation for APD approvals.

horizontal drilling and hydraulic fracking, Citizen Groups, through letters and in-person meetings, repeatedly requested a moratorium on further Mancos Shale drilling approvals pending completion of the legally-required NEPA process. BLM denied these requests.

## II.    DRILLING AUTHORIZATIONS GIVING RISE TO THIS LITIGATION

Horizontal well development in the Mancos Shale formation began in 2010 with two gas wells drilled in the northern portion of the San Juan Basin.[4] The first horizontal oil producing well was drilled in 2011 in the northwestern portion of the Basin, with a second oil well drilled in early 2012 in the southern portion—sparking increased industry interest and activity. *Id.* From this point in early 2012 through April of 2014, 70 horizontal wells were drilled and completed in the Mancos Shale. *Id.*

Because BLM has been less than transparent regarding its authorization of this development—with NEPA documentation neither available online nor in BLM's Farmington Field Office Reading Room throughout most of 2014—Citizen Groups have been unable to comment on the environmental impacts of this development or track its pace. In a letter to Citizen Groups, dated December 11, 2014, BLM stated: "EAs for routine APDs do not generally require a public comment period because of their routine nature, the tight regulatory timeframes, and because numerous public involvement opportunities are provided during the initial stages of project development."[5] At the continued urging of Citizen Groups, however, BLM began posting NEPA documentation for APD approvals to its website in February 2015.[6]

In a meeting between Citizen Groups and BLM on December 18, 2014, BLM stated that it had approved 119 individual applications for permit to drill ("APDs") targeting the Mancos

---

[4] 2014 RFDS at 8 (Exhibit 2).
[5] Dec. 11, 2015 BLM Letter to Citizen Groups (Exhibit 3).
[6] *See* BLM, *Farmington Field Office Document Library*, available at:
http://www.blm.gov/nm/st/en/fo/Farmington_Field_Office/ffo_document_library.html.

4

Shale since the beginning of 2014.[7] In response to a recent Freedom of Information Act

("FOIA") request, it is now evident that since January 1, 2014 through March 13, 2015, BLM

has approved 256 APDs targeting the Mancos Shale.[8] These records also indicate that the agency

continues to approve Mancos Shale drilling permits at an intense pace.

      For APD approvals, BLM routinely prepared separate EAs and Findings of No

Significant Impact ("FONSIs"). These EAs piecemeal the environmental impacts of Mancos

Shale development by limiting analysis to the disturbance anticipated from individual well

development and associated infrastructure within the APD footprint, and fail to provide any

planning or environmental review considering the full scale of past, ongoing, and reasonably

foreseeable cumulative development of Mancos Shale. Each EA also "tiers" to and incorporates

by reference the information and analysis contained in BLM's 2003 RMP/EIS—a plan and

environmental review that did not analyze horizontal drilling and hydraulic fracturing—and fails

to provide any meaningful analysis of horizontal drilling and hydraulic fracturing or associated

impacts to the air, water, land, climate, or human health in the San Juan Basin.

## III.    THIS LITIGATION AND THE NEED FOR A PRELIMINARY INJUNCTION

      On March 11, 2015, Citizen Groups filed this action challenging BLM's pattern and

practice of approving hundreds of individual drilling permits targeting the Mancos Shale in

violation of NEPA and the NHPA. Dkt. 1. Citizen Groups filed a motion for leave to file a

supplemental and amended petition for review (including as an exhibit the supplemented/

amended petition) on May 8, 2015, based on new well information and to provide an updated list

of the decisions challenged herein. Dkt. 13, 13-1. BLM continues to approve Mancos Shale

APDs, resulting in construction of roads, pipelines, well pads, as well as drilling and

---

[7] Mike Eisenfeld Decl. ¶ 9 (Exhibit 4).
[8] BLM APD Status Update (Exhibit 5).

hydraulically fracturing wells targeting the Mancos Shale.[9] The efficacy of Citizen Groups requested relief on the merits of this case—not to mention BLM's pending Mancos Shale RMP Amendment and EIS—is threatened by these ongoing violations because the drilling and fracking of wells, along with infrastructure construction, could be substantially completed by the time the Court resolves this case on the merits. On May 4 and May 8, 2015, Citizen Groups conferred with counsel for Federal Defendants regarding a voluntary stay of ground-disturbing activity for the drilling approvals challenged herein and a moratorium on further APD approvals pending resolution of this case; Federal Defendants refused Citizen Groups' requests. Accordingly, and to preserve the status quo, Citizens Groups now move for a preliminary injunction to enjoin all ground disturbance, construction, drilling, and other associated operations on all APD approvals challenged herein and to enjoin Federal Defendants from further approvals of Mancos Shale APDs pending resolution of the merits.

## ARGUMENT

To obtain a preliminary injunction, the moving party must establish: "(1) a likelihood of success on the merits; (2) a likelihood that the movant will suffer irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in the movant's favor; and (4) that the injunction is in the public interest." *RoDa Drilling Co. v. Siegal,* 552 F.3d 1203, 1208-09 (10th Cir. 2009) (citing *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). Where the latter three requirements "tip strongly" in Plaintiffs' favor, this Circuit applies a "modified" test for success on the merits in which the movant must demonstrate only "that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir.

---

[9] *See* BLM, *Onsites: Oil and Gas Well Permitting*, available at:
http://www.blm.gov/nm/st/en/fo/Farmington_Field_Office/ffo_oil_and_gas/ffo_onsites.html.

2002) (citation omitted). This modified test has been interpreted to mean "Plaintiffs may carry their burden of demonstrating likelihood of success on the merits … by demonstrating a 'fair ground for litigation' of one or more of their claims." *Colorado Wild*, 523 F. Supp. 2d at 1223.

Citizen Groups satisfy each element of the standard four-part test. The irreparable harm, balance of equities, and public interest elements also "tip strongly" in their favor, therefore Citizen Groups need only demonstrate satisfaction of the relaxed, modified merits standard, which they do herein.

## I.   CITIZEN GROUPS WILL SUFFER IRREPARABLE HARM IF THE COURT DOES NOT GRANT AN INJUNCTION

To constitute irreparable harm, an injury must be "certain, great, actual and not theoretical." *Vill. of Logan v. U.S. Dep't of Interior*, 577 F. App'x 760, 766 (10th Cir. 2014) (citations omitted); *see also Winter*, 555 U.S. at 22 (irreparable injury must be "likely" in the absence of an injunction). A plaintiff satisfies the irreparable harm requirement by demonstrating "a significant risk that he or she will experience harm that cannot be compensated after the fact by monetary damages." *Greater Yellowstone Coal. v. Flowers,* 321 F.3d 1250, 1258 (10th Cir. 2003). As the Supreme Court recognized: "Environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." *Amoco Prod. Co. v. Vill. of Gambell,* 480 U.S. 531, 545 (1987); *see also, Catron Cnty. Bd. of Comm'rs, New Mexico v. U.S. Fish & Wildlife Serv.*, 75 F.3d 1429, 1440 (10th Cir. 1996) (accord). While "harm to the environment may be presumed when an agency fails to comply with the required NEPA procedure … [p]laintiffs must still make a specific showing that the environmental harm results in irreparable injury to their specific environmental interests." *Davis*, 302 F.3d at 1115.

Here, Citizen Groups demonstrate irreparable harm from: (1) the harm to and permanent

destruction of environmental resources that will result from horizontal drilling and hydraulic

fracturing in the Mancos Shale; (2) the harm to public health as a result of ongoing Mancos

Shale development; and (3) BLM's continued authorization of Mancos Shale drilling permits

based on uninformed decisionmaking that fails to comply with NEPA.

### A. The Greater Chaco Landscape Will Be Irreparably Harmed by Continued and Future Horizontal Drilling and Hydraulic Fracturing of the Mancos Shale.

Courts have consistently found irreparable harm where the authorized activity will result

in impacts to the natural environment—the precise type of harm threatened here by fracking

Mancos Shale wells. For example, *San Luis Valley Ecosystem Council v. U.S. Fish & Wildlife

Serv.*, found irreparable harm from drilling two exploratory oil and gas wells disturbing 14 acres

of pubic land because such development would threaten, *inter alia*: "water for the community,

clean air, and [a] large expanse of undeveloped land with a significant 'sense of place' and

quiet[,]" and because plaintiffs "have interests in the water, wildlife, air, solitude and quiet, and

natural beauty [the area] provides." 657 F. Supp. 2d 1233, 1240 (D. Colo. 2009).[10] The court

specifically noted that individuals would be affected "by noise and their aesthetic interests … by

increased traffic and drill rigs." *Id.* Moreover, *San Luis Valley* enjoined well construction even

where impacts to environmental resources might be temporary and disturbance eventually

reclaimed. *Id.* at 1241. Other courts have similarly found irreparable harm where the proposed

action would impair the natural setting or result in harm to physical or aesthetic values in the

environment, none of which are compensable by money damages.[11]

---

[10] *See also Anglers of the AU Sable v. U.S. Forest Serv.,* 402 F. Supp. 2d 826, 837 (E.D. Mich. 2005) (staying development of a single 3.5-acre exploration well based on irreparable harm from destruction of "the quiet and peaceful aspects" of the tract; altered wildlife patterns; effects on predator-prey relationships; species habitat disturbance; and lost recreational opportunities.).

[11] *See Colorado Wild,* 523 F. Supp. 2d at 1220 (finding irreparable harm due to "environmentally destructive road construction" and associated site development); *Nat'l Wildlife Fed'n v. Burford,*

Here, Citizen Groups face each of these discrete environmental harms, but these harms are also magnified across the Greater Chaco Landscape through BLM's approval of at least 239 individual drilling permits targeting the Mancos Shale using fracking that BLM's current 2003 RMP/EIS did not analyze.[12] FONSIs for these 239 Mancos Shale wells purport to justify well construction; hydraulic fracture stimulation; well pad, road, and pipeline construction; as well as new facility installation and expansion of existing facilities—actions that BLM never considered in the 2003 RMP/EIS.[13] These 239 horizontal Mancos Shale wells result in impacts to environmental resources substantially greater than ever contemplated by the 2003 RMP/EIS, including surface impacts to 1,253 acres;[14] increased air pollutant emissions of between 242% and 333%;[15] 4,820 days of flaring or venting nitrogen and natural gas;[16] incremental Volatile Organic Compound ("VOC") and Hazardous Air Pollutants ("HAPs") emissions of 2,836 tpy and 284 tpy respectively;[17] use of 241 million gallons of freshwater;[18] production facility impacts involving several thousand more tanks and compressors;[19] habitat fragmentation and loss of up to 31 times the area of physical disturbance (38,843 acres);[20] and, truck traffic of 2,300 round

---

835 F.2d 305, 323 (D.C. Cir. 1987) (issuing a preliminary injunction where "any mining or leasing could cause irreparable injury by permanently destroying wildlife habitat, air and water quality, natural beauty, and other environmental and aesthetic values and interests."); *Davis*, 302 F.3d at 1115-16 (finding irreparable harm to recreational uses by "disrupt[ing] the natural setting and feeling" of the affected area).

[12] *See* Exhibit B to Susan Harvey Decl. and ¶¶ 12-17 (Exhibit 6). Ms. Harvey's declaration includes five exhibits designated A through E.

[13] *Id.* ¶ 26.

[14] *Id.* ¶ 35 and Exhibit E.

[15] *Id.* ¶¶ 45-49 and Exhibit D.

[16] *Id.* ¶¶ 52-56.

[17] *Id.* ¶¶ 62-63.

[18] *Id.* ¶¶ 74-76.

[19] *Id.* ¶¶ 81-85.

[20] *Id.* ¶¶ 94-101.

trips per well, or 554,300 total round trips.[21] BLM has never analyzed the direct, indirect, and cumulative impacts of this development in any environmental document.

These impacts cause or contribute to specific harm suffered by individual members of Citizen Groups including, for example: degradation of their use and enjoyment of Chaco Culture National Historical Park, the surrounding areas and cultural sites and resources; impacts to air quality and water quality; disturbance from flaring; impacts to the visual landscape and night skies; a reduction in solitude and quiet; impacts to the grazing of sheep and cattle; increased noise; increases in traffic; increases in violent crime; and opportunities for spiritual experiences associated with the natural landscape and the holding of traditional cultural and ceremonial practices.[22] This environmental harm is irreparable.

### B.   The Public Health of Diné And Other Community Members is Threatened by Ongoing and Future Development of the Mancos Shale.

In addition to the irreparable harm inflicted on Citizen Groups' members from degradation of the Greater Chaco Landscape, Citizen Groups' members are also suffering enduring impacts to their health and wellbeing through ongoing development of the Mancos Shale. In similar cases where a proposed action threatens to adversely affect human health, courts have issued preliminary injunctions. For example, in *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, the court issued a preliminary injunction where the proposed action "will emit substantial quantities of air pollutants that endanger human health and the environment and thereby cause irreparable harm." 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (finding that "remedies available at law, such as monetary damages, are inadequate to compensate for th[e] injury.")

---

[21] *Id.* ¶¶ 102-105.
[22] Eisenfeld Decl. ¶¶ 5, 12, 13; Sarah White Decl. ¶¶ 3, 5-7, 10 (Exhibit 7); Victoria Gutierrez Decl. ¶¶ 3-6, 8 (Exhibit 8); Ruthie Locke Decl. ¶¶ 3, 5, 7 (Exhibit 9).

(quoting *Monsanto v. Geertson Seed Farms*, 561 U.S. 139, 141 (2010)).[23]

The harm to human health from oil and gas operations is well documented and acknowledged by the scientific and medical communities.[24] For example, hydraulic fracturing involves the use of chemicals known to impact and cause long-term harm to organs and body systems, including impacts to skin, eyes, sensory organs, the respiratory system, the gastrointestinal system, and the liver.[25] Moreover, oil and gas operations result in elevated concentrations of health-damaging air pollutants such as VOCs, aromatic hydrocarbons, particulate matter, and ground level ozone.[26] Hydraulic fracturing also results in elevated risk of water contamination with a significant potential to lead to adverse health outcomes.[27]

Here, Citizen Groups' members suffer from many of these adverse health conditions.[28] Such adverse human health impacts are irreparable.

### C. BLM's Continued Authorization of Mancos Shale Drilling Permits Absent NEPA Compliance Threatens Irreparable Harm.

Citizen Groups are also threatened with irreparable harm through ongoing and future approval of Mancos Shale drilling permits absent NEPA compliance. As a procedural statute, NEPA's fundamental purpose is to influence the agency's decisionmaking process "by focusing the [federal] agency's attention on the environmental consequences of a proposed project," so as

---

[23] *See also, Fairway Shoppes Joint Venture v. Dryclean U.S.A. of Florida, Inc.,* 1996 WL 924705 at *10 (S.D. Fla. 1996) ("the requirement of irreparable harm for a preliminary injunction is satisfied by showing a threat of harm to the public health or environment: actual harm to human health or the environment is not required to preliminarily enjoin the polluter.").
[24] Adam Law Decl. ¶ 6 (Exhibit 10).
[25] *Id.* ¶¶ 7-15.
[26] *Id.* ¶¶ 16-20, 29-32.
[27] *Id.* ¶¶ 21-24.
[28] *See* Gutierrez Decl. ¶¶ 4, 7 (describing dizziness, eye irritation, headaches, respiratory illness and mental anguish); White Decl. ¶¶ 6, 10 (describing harm to immune system, respiratory health, and water contamination); Locke Decl. ¶¶ 2, 3, 5, 7 (describing stroke, swollen abscess, respiratory infections, heart and immune deficiencies); Eisenfeld Decl. ¶ 12 (describing harm to air quality and concerns with health).

to "ensure[ ] that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Robertson v. Methow Valley Citizens Council,* 490 U.S. 332, 349 (1989). *See also Sierra Club v. Hodel,* 848 F.2d 1068, 1097 (10th Cir. 1988) (The purpose of NEPA is to ensure that the agency and the public are aware of the environmental consequences of a project *before* beginning the project.). The "assessment of all 'reasonably foreseeable' impacts must occur at the earliest practicable point, and must take place before an 'irretrievable commitment of resources' is made." *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 718 (10th Cir. 2009); 42 U.S.C. § 4332(2)(C)(v); 40 C.F.R. §§ 1501.2, 1502.22.

Accordingly, courts routinely issue preliminary injunctions where, as here, the agency fails to comply with the required NEPA procedure. *Davis,* 302 F.3d at 1114 ("In mandating compliance with NEPA's procedural requirements as a means of safeguarding against environmental harms, Congress has presumptively determined that the failure to comply with NEPA has detrimental consequences for the environment."). "[W]hen a decision to which NEPA obligations attach is made without the informed environmental consideration that NEPA requires, the harm that NEPA intends to prevent has been suffered." *Sierra Club v. Marsh,* 872 F.2d 497, 500 (1st Cir. 1989) (citations omitted). As explained by a court in this Circuit:

> Thus, the irreparable injury threatened here is not simply whatever ground-disturbing activities are conducted in the relatively short interim before this action is decided, it is the risk that in the event the [agency's NEPA decisions] are overturned and the agency is required to 'redecide' the [ ] issues, the bureaucratic momentum created by Defendants' activities will skew the analysis and decision-making of the [agency] towards its original, non-NEPA compliant [ ] decision.

*Colorado Wild*, 523 F. Supp. 2d at 1221; *see also, Marsh,* 872 F.2d at 504 ("The difficulty of stopping a bureaucratic steam roller, once started ... seems to us ... a perfectly proper factor for a

district court to take into account ... on a motion for preliminary injunction.").[29]

Here, BLM is willfully ignoring NEPA procedure. Although recognizing that "[a]s full-field development occurs, especially in the [Mancos] shale oil play, additional impacts may occur that previously were not anticipated … or analyzed … which will require an EIS-level plan amendment[,]" 79 Fed. Reg. 10,548, BLM is nevertheless approving hundreds of Mancos Shale drilling permits *before* it has completed this required EIS-level analysis. *See Methow Valley*, 490 U.S. at 349 (agencies must "look before they leap"). BLM has consistently failed to provide sufficient analysis of Mancos Shale development using fracking, in violation of NEPA.[30]

## II.  THE BALANCE OF HARMS FAVORS GRANTING AN INJUNCTION

The environmental, health, and procedural harms faced by Citizen Groups strongly outweighs any ostensible harm Federal Defendants may face through delay. Indeed, it is unclear that Federal Defendants would suffer *any* harm by being required to analyze the impacts of Mancos Shale development, as NEPA demands, before approving additional drilling permits or if ground-disturbing activities at the approved drill sites challenged herein are temporarily enjoined. Moreover, any injury incurred by Federal Defendants through a delay in drilling is both speculative and pales compared to the irreparable harm faced by Citizen Groups detailed above. As the Supreme Court recognized, "the balance of harms will usually favor the issuance of an injunction to protect the environment." *Amoco*, 480 U.S. at 545. This case is no exception.

With respect to the relationship between balancing of harms and merits of the case, the

---

[29] *See also San Luis Valley*, 657 F. Supp. 2d at 1241-42 ("Plaintiffs' procedural interest in a proper NEPA analysis is likely to be irreparably harmed if [the industry proponent] were permitted to go forward with the very actions that threaten the harm NEPA is intended to prevent, including uninformed decisionmaking."); *Save Strawberry Canyon v. Dep't of Energy*, 613 F.Supp.2d 1177, 1187 (N.D. Cal. 2009) ("There is no doubt that the failure to undertake an EIS when required to do so constitutes procedural injury to those affected by the environmental impacts of a project.").

[30] *See, e.g.*, Harvey Decl. ¶¶ 15, 20, 23, 28, 36, 42, 50, 59, 65, 77, 85, 94, 102, 107.

Tenth Circuit teaches:

> In general, emphasis on the balance of irreparable harm to plaintiffs and
> defendants results in a sliding scale that demands less of a showing of likelihood
> of success on the merits when the balance of hardships weighs strongly in favor of
> the plaintiff, and vice versa. Thus, the more likely a movant is to succeed on the
> merits, the less the balance of irreparable harms need favor the movant's position.

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1002 (10th Cir.

2004) (citations omitted). "[T]he presence of strong NEPA claims gives rise to more liberal

standards for granting an injunction. If environmental injury is sufficiently likely, the balance of

harms will usually favor the issuance of an injunction to protect the environment." *High Sierra*

*Hikers Ass'n v. Blackwell,* 390 F.3d 630, 643 (9th Cir. 2004) (citations omitted). Here, there is

both a strong likelihood of success on the merits, as discussed below, as well as irreparable harm

if preliminary relief is not granted—tipping the balance decidedly in Citizen Groups' favor.

Moreover, the balance of harms from any potential delay in BLM's APD approvals and

subsequent drilling activity—which is subject to compliance with NEPA and the protection of

natural resources[31]—also tips decidedly in favor of Citizen Groups. As demonstrated in BLM's

APD Status Update (Exhibit 5), and by its own admission, BLM has been approving individual

Mancos Shale drilling permits in the absence of a "required EIS-level analysis." 79 Fed. Reg.

10,548. Each drilling approval violates NEPA for this reason. *See Marsh v. Or. Natural Res.*

*Council*, 490 U.S. 360, 371, (1989) (holding "NEPA ensures that the agency will not act on

---

[31] 43 C.F.R. § 3161.2 (requiring "all [oil and gas] operations be conducted in a manner which
protects other natural resources and the environmental quality, protects life and property…"); 43
C.F.R. § 3162.1(a) ("The [oil and gas] operating rights owner or operator … shall comply with
applicable laws and regulations;" including "conducting all operations in a manner … which
protects other natural resources and environmental quality."). *See also* 30 U.S.C. § 226(p)(2)(A)
(requiring BLM to defer APD approval where it has not sufficiently completed the NEPA
process, or where approval would not be in compliance with other applicable laws).

incomplete information, only to regret its decision after it is too late to correct.").[32]

Finally, any potential economic harm to BLM does not outweigh Citizen Groups' environmental, health, and procedural harms. "[F]inancial concerns alone generally do not outweigh environmental harm." *Valley Cmty. Pres. Comm'n v. Mineta*, 373 F.3d 1078, 1086 (10th Cir. 2004); *see also, Acierno v. New Castle Cnty.,* 40 F.3d 645, 653 (3d Cir. 1994) (recognizing that "[e]conomic loss does not constitute irreparable harm..."). In an analogous case from this Circuit, *San Luis Valley* halted construction of a drilling project because the "likelihood of irreparable environmental injury and the risk of uninformed decisionmaking regarding such delicate and intertwined natural resources, outweighs any potential harm accruing to Defendants." 657 F.Supp.2d at 1242. There, the court concluded the balance of harms favored the environmental plaintiffs because "harm, delay in drilling the exploratory wells, is not irreparable in that it can be compensated by money damages." *Id.*[33] Similarly, any monetary interest that Federal Defendants may allege cannot outweigh the injuries that Citizen Groups would suffer in the absence of an injunction.

---

[32] *See also Grand Canyon Trust v. Federal Aviation Administration,* 290 F.3d 339, 342 (D.C. Cir. 2002) (in evaluating the environmental consequences of a proposed action, the agency "must give a realistic evaluation of the total impacts and cannot isolate a proposed action, viewing it in a vacuum."); *Gold, et al.*, 108 IBLA 231 (April 24, 1989) (holding where an *initial* well has been successfully drilled and "activities proceeded from exploration to development," the agency "would be required to consider the cumulative and synergistic effects of not only the individual [APD] but the entire field development" through an EIS). Here, where BLM has permitted hundreds of wells, BLM's duty to undertake an analysis of the cumulative impacts of full-field development is beyond doubt.

[33] *See also Colorado Wild,* 523 F.Supp.2d at 1222 ("[E]conomic harm, however, is not irreparable and does not outweigh the serious risk that irreparable environmental harm will result if [the project proponent] is allowed to proceed with [development] in reliance on the [agency's] decision."); *Save Our Sonoran, Inc. v. Flowers,* 408 F.3d 1113, 1125 (9th Cir.2005) (affirming preliminary injunction in NEPA case because, while developer "may suffer financial harm" if injunction issued, balance of harms favored issuance of injunction where irreparable harm was likely if development was allowed to proceed without proper review).

III.     **THE PUBLIC INTEREST FAVORS GRANTING AN INJUNCTION**

The public interest also strongly favors a preliminary injunction. Citizen Groups'

interests in preserving and protecting the environment and human health, as well as ensuring

compliance with relevant environmental laws, are inherently in the public interest.

There is a strong public interest in protecting the environment and public health, which is

threatened by ongoing and future drilling of the Mancos Shale. As recognized in *Colorado Wild*

*v. U.S. Forest Serv.,* "[t]here is an overriding public interest in the preservation of biological

integrity and the undeveloped character of the Project area that outweighs public or private

economic loss in this case." 299 F.Supp.2d 1184, 1190-91 (D. Colo. 2004).[34] Likewise, the

"protection of human health, safety and the affected communities also serves the public interest."

*San Luis & Delta-Mendota Water Auth. v. Locke*, 2010 WL 500455, at *8 (E.D. Cal. 2010). An

injunction in this case is vital to protecting the public interest by preventing ongoing

environmental harm and public health impacts from development of the Mancos Shale.

Similarly, "the public has an interest in ensuring that federal agency actions … comply

with the requirements of NEPA." *Sierra Club*, 841 F. Supp. 2d at 360. As recognized in

*Colorado Wild*: "The public has an undeniable interest in the [agency's] compliance with

NEPA's environmental review requirements and the informed decision-making that NEPA is

designed to promote." 523 F.Supp.2d at 1223. Indeed, the refusal of administrative agencies to

comply with environmental laws "invokes a public interest of the highest order: the interest in

having government officials act in accordance with law." *Seattle Audubon Society v. Evans,* 771

F. Supp. 1081, 1096 (W.D. Wash. 1991).

---

[34] *See also Wyoming Outdoor Coordinating Council v. Butz*, 484 F.2d 1244, 1250 (10th Cir. 1973) ("[T]here is an overriding public interest in preservation of the undeveloped character of the area recognized by the statute.") *overruled on other grounds by Vill. of Los Ranchos De Albuquerque v. Marsh*, 956 F.2d 970 (10th Cir. 1992).

While Defendants may assert that oil and gas development is in the public interest, the approval of such development is subject to and does not supersede the public's interest in environmental protection, public health, and compliance with federal law. *See* 43 C.F.R. §§ 3161.2, 3162.1(a); 30 U.S.C. § 226(p)(2)(A). On this point, in a case involving natural gas development on public lands, the District of Wyoming held:

> The Court is cognizant of the importance of mineral development to the economy of the State of Wyoming. Nevertheless, mineral resources should be developed responsibly, keeping in mind those other values that are so important to the people of Wyoming, such as preservation of Wyoming's unique natural heritage and lifestyle. The purpose of NEPA … is to require agencies … to take notice of these values as an integral part of the decisionmaking process.

*Wyo. Outdoor Council v. U.S. Army Corps of Eng'rs*, 351 F.Supp.2d 1232, 1260 (D.Wyo. 2005). Similarly here, the public interest in protecting our environment, human health, and ensuring lawful agency decisionmaking strongly favors the need for a preliminary injunction.

## IV.   CITIZEN GROUPS ARE LIKELY TO SUCCEED ON THE MERITS

NEPA is the "basic national charter for protection of the environment," and the "centerpiece of environmental regulation in the United States." 40 C.F.R. § 1500.1; *New Mexico ex rel Richardson*, 565 F.3d at 703. Congress enacted NEPA to ensure that Federal projects do not proceed until the Federal agency analyzes all environmental consequences associated with those projects. 42 U.S.C. § 4332(2)(C). As discussed above, BLM has approved development of 239 new wells in the Mancos Shale using fracking without analyzing *any* of fracking's environmental impacts, as well as improperly tiering to a programmatic EIS that simply does not include any analysis of fracking's impacts. These failures violate NEPA's requirements that the agency take a hard look at the direct, indirect, and cumulative impacts of its actions *before*

authorizing those actions.[35] *Id.*; *see also Methow Valley*, 490 U.S. at 349-50; 40 C.F.R. §§ 1502.1, 1508.25(c).

Citizen Groups are likely to succeed on each of these claims. And, even if this Court concludes that Citizen Groups are likely to succeed on only one claim, an injunction must issue. *See Colo. Wild*, 523 F.2d at 1223. Moreover, given that the first three factors tip sharply in Citizen Groups' favor, they need only show a "fair ground for litigation" on one of their claims, a showing they easily meet. *Id.*

### A. BLM Violated NEPA by Failing to Analyze the Environmental Impacts of Fracking Authorized by the Challenged APDs.

#### 1. BLM Tiered to an EIS That Does Not Analyze the Impacts of Horizontal Fracking.

Oil and gas development involves several stages of decisionmaking that are subject to NEPA. *See New Mexico ex rel Richardson*, 565 F.3d at 716-18; *Pennaco Energy, Inc. v. USDOI*, 377 F.3d 1147, 1151-52 (10th Cir. 2004). The APD stage is the third and final stage of the process where BLM authorizes the drilling of specific wells only after the agency conducts a site-specific NEPA analysis of drilling's reasonably foreseeable environmental impacts. *Pennaco*, 377 F.3d at 1151-52, 1160; 43 C.F.R. § 3162.3-1. In this multistage decisionmaking process, NEPA permits BLM to analyze the impacts of oil and gas development through a

---

[35] Because NEPA does not include a citizen suit provision, a plaintiff may challenge final agency action that violated NEPA pursuant to the Administrative Procedure Act ("APA"). 5 U.S.C. §§ 702, 704; *Utah Shared Access Alliance v. Carpenter*, 463 F.3d 1125, 1134 (10th Cir. 2006). The Court reviews BLM's actions under the "arbitrary and capricious" standard. 5 U.S.C. § 706(2)(A). Agency action is arbitrary if "the agency has relied on factors which Congress had not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Colo. Envtl. Coal. v. Dombeck*, 185 F.3d 1162, 1167 (10th Cir. 1999) (citations omitted). Because there is not yet an administrative record for this case, Citizen Groups has included excerpts from four challenged EAs to support their arguments for likelihood of success on the merits.

practice known as "tiering." Tiering occurs when an agency has completed a "broad

environmental impact statement" for a program and subsequently prepares a narrower NEPA

analysis for "an action included within the entire program." 40 C.F.R. §§ 1502.20, 1508.28.

However, NEPA only permits tiering when the project being considered is part of the broader

agency action addressed in the earlier NEPA document. 40 C.F.R. § 1502.20. Tiering is

inappropriate where a site-specific action is not part of the activity or program analyzed by the

broader EIS. 40 C.F.R. § 1508.28; *see Pennaco*, 377 F.3d at 1152-54, 1156-57, 1159-60 (agency

could not rely on programmatic EIS that did not address the impacts of the leasing decision at

issue); *Mont. Wilderness Ass'n v. Fry*, 310 F. Supp. 2d 1127, 1145-46 (D. Mont. 2004) (NEPA

analysis for leasing decision could not rely on earlier EIS that did not address oil and gas

development). Where a broader EIS does not encompass the environmental impacts of the site-

specific action, BLM cannot rely on it to provide the NEPA analysis for that site-specific action.

    Here, rather than analyze Mancos Shale fracking's environmental impacts in a

programmatic EIS, BLM's EAs for APD approvals tier to Farmington's 2003 RMP/EIS,[36] which

did not analyze the environmental impacts of fracking. As reiterated throughout, BLM has

already conceded that an EIS-level plan amendment is required to analyze the impacts of

horizontal fracking. *See* 79 Fed. Reg. 10,548. Thus, BLM's decision to tier to the 2003 RMP/EIS

in lieu of doing this analysis violates NEPA. *See Ctr. for Biological Diversity v. Bureau of Land*

*Mgmt.*, 937 F.Supp.2d 1140, 1157 (N.D. Cal. 2013) (holding that tiering to an EIS was

inadequate to fulfill the requirements of NEPA because "the scale of fracking in shale-area

drilling today involves risks and concerns that were not addressed" by the previous EIS).

Although BLM is in the process of amending the 2003 RMP and preparing an EIS to satisfy this

---

[36] *See, e.g.*, EA 2014-0175 at 2 (Exhibit 11); EA 2015-0066 at 2 (Exhibit 12); EA 2015-36 at 2
(Exhibit 13); EA 2015-0045 at 2 (Exhibit 14).

deficiency, that process is ongoing and BLM has not yet offered a draft EIS for public comment.

NEPA is a "look before you leap" statute requiring BLM to consider the environmental impacts of proposed actions *before* approving the action. 42 U.S.C. § 4332(2)(C)(i); 40 C.F.R. §§ 1508.25(c), 1508.9(b). Thus, even though BLM has initiated the NEPA process to analyze the environmental impacts of fracking, because it has not completed its analysis the agency cannot continue to approve APDs for fracking in Mancos Shale *until* it has competed its analysis of the impacts of that activity. *Diné CARE v. U.S. Office of Surf. Mining Reclamation and Enforcement*, 2015 WL 996605 at *11 (D. Colo. March 2, 2015) (rejecting as contrary to NEPA agency's argument that it could satisfy NEPA for a mine expansion it had already approved through a pending NEPA process analyzing impacts of expansion). Thus, BLM's ongoing decisions to tier to the 2003 RMP/EIS in lieu of doing an analysis of fracking impacts violate NEPA.

As discussed above, the 2003 RMP/EIS did not mention Mancos Shale, let alone analyze the environmental impacts of or consider alternatives to fracking this formation. While the 2001 RFDS mentions Mancos Shale, the RFDS is not an environmental document prepared pursuant to NEPA, and it does not analyze the environmental impacts of projected development. *See* 40 C.F.R. § 1508.10. Therefore, BLM cannot tier to an RFDS to meet its NEPA obligations. *See*, *e.g.*, *Kern v. BLM*, 284 F.3d 1062, 1073 (9th Cir. 2002) (holding that "tiering to a document that has not itself been subject to NEPA review is not permitted, for it circumvents the purpose of NEPA"); *Pennaco*, 377 F.3d at 1159. Even if this were not the case, development of this formation was considered uneconomic and thus not foreseeable.[37] Moreover, BLM's consideration of Mancos Shale in the 2001 RFDS was an afterthought to drilling vertical Dakota wells. The RFDS did not contemplate accessing that formation using horizontally-drilled wells.

---

[37] 2001 RFDS at 5.24.

Horizontal fracking is a relatively new technology and was not used in the Mancos Shale until recently, 70 Fed. Reg. 10,548. BLM has nevertheless been approving development that applies this technology without taking a "hard look" at the environmental consequences or considering alternatives and without programmatic-level planning authorization—thus engaging in "precisely the type of environmentally blind decision-making NEPA was designed to avoid." *Connor v. Burford*, 836 F.2d 1521, 1531 (9th Cir. 1988). BLM's belief that the 2003 RMP/EIS analyzed the impacts of horizontal fracking in Mancos Shale "runs counter to the evidence before the agency," and its attempts to tier to the 2003 RMP/EIS were arbitrary and capricious. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

## 2.    BLM Failed to Analyze the Cumulative Impacts of Drilling 239 New Wells in Mancos Shale.

NEPA requires agencies to consider the environmental impacts of their proposed actions in "context." 40 C.F.R. § 1508.27(a). This context is assessed, in part, through a "cumulative impacts" analysis addressing "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 CFR § 1508.7. By requiring analysis of the "cumulative impacts [that] result from individually minor but collectively significant actions taking place over a period of time," NEPA ensures that agency decisions affecting the environment are not made in a vacuum. *Id*.; *see also Wilderness Workshop v. BLM*, 531 F.3d 1220, 1228 n.8 (10th Cir. 2008); *N. Plains Res. Council v. Surface Trsp. Bd.*, 668 F.3d 1067, 1078-79 (9th Cir. 2011) (holding an agency is not permitted to pretend its project "operat[ed] in a vacuum" by ignoring reasonably foreseeable cumulative impacts of nearby drilling). This prevents agencies from undertaking a piecemeal review of environmental impacts. *Earth Island Inst. v. USFS*, 351 F.3d 1291, 1306-07 (9th Cir. 2003). Yet a piecemeal review is exactly what

BLM did here by approving hundreds of individual APDs using boilerplate EAs that limit the impacts analysis area to the APD footprint (and little to no site-specific analysis even then).

The EAs prepared for individual Mancos Shale APDs provide no hint that BLM has approved over 200 other Mancos Shale drilling permits in the same area. Nor do the EAs provide any estimates of combined environmental effects from the numerous wells drilled or to be drilled in the future, or how aggregate effects to air and water, for example, may affect public health and visibility. NEPA prohibits BLM from considering individual APDs, as it does here, in a vacuum. *Great Basin Mine Watch v. Hankins*, 456 F.3d 955, 973 (9th Cir. 2006) (holding agency violated NEPA when it failed to analyze cumulative impacts of proposed mine together with other existing mines in the area); *Grand Canyon Trust,* 290 F.3d at 342.

Here, instead of addressing the cumulative environmental impacts of drilling in the area, the EAs for the APDs: (1) purport to rely on cumulative effects analysis from the 2003 RMP/EIS and a non-NEPA document (the 2001 RFDS) for air quality impacts; (2) do not address in any way cumulative drilling impacts to cultural resources; and (3) in the few EAs that discuss community impacts, address only the positive economic cumulative impacts of drilling to local communities without any discussion of how drilling negatively impacts those communities. First, with respect to air quality, BLM's EAs explicitly tier to the cumulative impacts analysis in the 2003 RMP/EIS and a non-NEPA document.[38] This tiering fails for the same reasons discussed above: the 2003 NEPA analysis was limited to conventional, *i.e.* vertical, drilling methods to access the Dakota formation and did not address impacts from Mancos Shale extraction using fracking.[39] Nor can BLM rely on a non-NEPA document as a surrogate for a cumulative impacts analysis because the agency cannot tier to a non-NEPA document "that has not itself been

---

[38] *See* EA 2014-0175 at 28; EA 2015-0066 at 25; EA 2015-0036 at 23-24; EA 2015-0045 at 22.
[39] *See* Harvey Decl. at ¶¶ 42-43.

subject to NEPA review."[40] *Kern,* 284 F.3d at 1073; s*ee also S. Fork Band Council of W.*

*Shoshone of Nev. v. U.S. Dep't of Interior*, 588 F.3d 718, 726 (9th Cir. 2009) (holding that "[a]

non-NEPA document … cannot satisfy a federal agency's obligations under NEPA.").

Second, BLM's EAs do not include any analysis of drilling's cumulative impacts to

cultural resources. BLM simply makes the cursory statement that because "significant cultural

sites will be avoided" there will be no impacts to these resources.[41] This conclusion is arbitrary

because BLM has unlawfully limited its impacts analysis only to cultural resources within each

APD footprint and completely ignored both the variety of landscape-level cultural resources

present outside the APD footprints, such as to Chaco Culture National Historical Park, as well as

the potentially significant noise, visual, and seismic impacts to those resources from activities

occurring within the APDs.[42] *New Mexico ex. rel. Richardson*, 459 F. Supp. 2d at 1124-25,

recognized that BLM cannot limit its impacts analysis only to cultural resources present within a

narrow project footprint, and must analyze impacts to all potentially impacted cultural resources

regardless of whether they are located within the boundaries of the project footprint.

Finally, BLM's analysis of cumulative impacts to local communities is arbitrary because

BLM either failed to analyze these impacts at all[43] or, where it did mention impacts to local

communities, only disclosed the economic *benefits* of drilling while ignoring drilling's social and

environmental costs to local communities such as air and water pollution.[44] An agency must

"consider every significant aspect of the environmental impact of a proposed action." *Baltimore*

---

[40] Moreover, the 2001 RFDS does not include an analysis of the environmental impacts of projected oil and gas development.
[41] *See* EA 2014-0175 at 41; EA 2015-0066 at 33; EA 2015-0036 at 36; EA 2015-0045 at 32.
[42] *Id*. at 39-40; *id*. at 32; *id*. at 36; *id*. at 31.
[43] The majority of the EAs for the challenged decisions do not include *any* discussion of drilling's impacts to local communities.
[44] *See*, *e.g.*, EA 2015-0066 at 38.

*Gas & Elec. Co.*, 462 U.S. at 107 (quotations and citation omitted). To fulfill this mandate, agencies must disclose the "ecological[,] … economic, [and] social" impacts of a proposed action. 40 C.F.R. § 1508.8(b); *Sierra Club v. Sigler*, 695 F.2d 957, 979 (5th Cir. 1983) (recognizing that once agency chose to "trumpet" a set of benefits, it also had duty to disclose the related costs). "There can be no hard look at costs and benefits unless all costs are disclosed." *Id.*; *see also High Country Conserv. Advocates v. USFS*, 2014 WL 2922751 at *10-11 (D. Colo. June 27, 2014) (held BLM violated NEPA by considering only the economic benefits of coal mining without also considering social and environmental costs).

For the decisions challenged here in which BLM discussed potential impacts to local communities, the agency violated NEPA by failing to disclose drilling's impacts on local communities while relying on drilling's alleged social and economic *benefits* to support its conclusions that Mancos shale development would not have any negative cumulative impacts on those communities.[45] The selective, one-sided analysis was arbitrary and violated NEPA.

### B.      BLM Unlawfully Segmented its APD Approvals.

The largely boilerplate EAs BLM has been preparing for individual APDs, and which, together, effectively allow full-field Mancos Shale development despite failing to analyze the environmental impacts of that development, do not satisfy BLM's duty to assess impacts and consider alternatives to connected and cumulative actions. 40 C.F.R. § 1508.25(a). An agency cannot "avoid the … requirement that an EIS be prepared for all major federal actions with significant environmental impacts by dividing an overall plan into component parts, each involving action with less significant environmental impacts." *Taxpayers Watchdog, Inc. v. Stanley*, 819 F.2d 294, 298 (D.C. Cir. 1987) (emphasis added). The Supreme Court made clear

---

[45] EA 2015-0066 at 38.

that "when several proposals for [ ] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976). In other words, federal agencies may not "'segment' [their] overall program, thereby unreasonably constricting the scope of … environmental evaluation." *Nat'l Wildlife Fed. v. Appalachian Reg. Comm'n*, 677 F.2d 883, 889 (D.C. Cir. 1981). Here, BLM is unlawfully "dividing [its] overall plan into component parts" by approving full-field development through separate EAs, rather than deferring APD approvals until BLM has completed an EIS analyzing full-field development as a whole. *Stanley*, 819 F.2d at 298.

BLM admits that each APD approval is made, and will continue to be made, on a strictly "case-by-case" basis.[46] Yet the EAs supporting APD approvals are virtually identical.[47] Moreover, none of the EAs for APD approvals even begins to analyze the environmental impacts of Mancos Shale development using fracking; the EAs simply describe the fracking process.[48] Rather, each EA in only a cursory fashion discusses the effects within the footprint of the individual APDs under consideration.[49] Similarly, none of the EAs consider the cumulative impacts of all previously approved APDs or pending APDs currently before BLM.[50] It is precisely this avoidance of the overall impacts of an activity that NEPA forbids. *See Friends of the Earth v. U.S. Army Corps. of Eng.*, 109 F. Supp. 2d 30, 33-34, 43 (D.D.C. 2000) (holding the Corps' attempt to piecemeal environmental effects by doing individual EA for each of three proposed casinos violated NEPA's cumulative impacts analysis requirement). Here too, although

---

[46] *See* BLM Letter, Dec. 11, 2014 (Exhibit 3).
[47] *Compare* EA 2014-0175 at 41 *to* EA 2015-0066 at 33 (discussing cultural resources).
[48] *See* EA 2014-0175 at 30EA 2015-0066 at 5; EA 2015-0036 at 26; EA 2015-45 at 6; Harvey Decl. ¶¶ 41, 44, 53, 67.
[49] *See id.* ¶¶ 20, 36, 99.
[50] *See id.* ¶¶ 40, 44, 99.

BLM is preparing EAs for APDs, the agency has failed to consider the cumulative impacts of all the Mancos Shale APDs. *See* 40 C.F.R. § 1508.7 (NEPA regulation requiring consideration of incremental impacts).

In short, the entire procedural and informational thrust of NEPA is being defeated by BLM's piecemeal APD approvals without ever considering the full scope of the environmental consequences of the agency's decisions. *See Methow Valley*, 490 U.S. at 349 (NEPA ensures that "important effects will not be overlooked or underestimated only to be discovered after … the die [is] cast"). Thus, while the CEQ regulations explain that "[t]he NEPA process is intended to help public officials make decisions that are based on understanding of environmental consequences," 40 C.F.R. §1500.1(c), BLM is proceeding blind to these consequences.

## V.   THE COURT SHOULD NOT IMPOSE A BOND

If this Court enters an injunction, Citizen Groups respectfully request that the Court waive the bond requirement, or impose a nominal bond under the public interest exception to Rule 65(c). Where, as here, Plaintiffs seek to advance the public interest through the enforcement of environmental laws, courts in this Circuit consistently waive or require only a minimal bond. *See Davis,* 302 F.3d at 1126 ("Ordinarily, where a party is seeking to vindicate the public interest served by NEPA, a minimal bond amount should be considered."); *Colorado Wild,* 523 F. Supp. 2d at 1230-31 (accord).

## CONCLUSION

Citizen Groups satisfy the test for a preliminary injunction, and therefore respectfully request this Court to preserve the status quo and enjoin: (1) all ground disturbance, construction, drilling, and other associated operations on all APD approvals challenged herein, and (2) future APD approvals targeting the Mancos Shale formation pending resolution on the merits.

26

Respectfully submitted this 11th day of May 2015,

/s/ Kyle J. Tisdel
Kyle J. Tisdel
tisdel@westernlaw.org

WESTERN ENVIRONMENTAL LAW CENTER
208 Paseo del Pueblo Sur, Suite 602
Taos, New Mexico 87571
(p) 575.613.8050

*Counsel for Plaintiffs*

/s/ Samantha Ruscavage-Barz
Samantha Ruscavage-Barz
sruscavagebarz@wildearthguardians.org

WILDEARTH GUARDIANS
516 Alto Street
Santa Fe, NM 87501
(p) 505.401.4180
(f) 505.213.1895

*Counsel for Plaintiff WildEarth Guardians*

27

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**
**CERTIFICATE OF SERVICE (CM/ECF)**

I hereby certify that on May 11, 2015, I electronically filed the foregoing PLAINTIFFS'
MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION with the
Clerk of the Court via the CM/ECF system, which will send notification of such filing to the
following counsel of record:

<u>For Federal Defendants:</u>

Clare M. Boronow
U.S. Department of Justice
Environment and Natural Resources Division Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Phone: 202.305.0492
Email: clare.boronow@usdoj.gov

Justin A. Torres
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
P.O. Box 7611
Washington, DC 20044-7611
Phone: 202.305.0874
Email: justin.torres@usdoj.gov

/s/ Kyle Tisdel
Western Environmental Law Center
Counsel for Plaintiffs

28